**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**LYNN A. FOX,**

        **Plaintiff,**

                                       **Civil Action 2:11-cv-1011**

     **v.**                            **Judge Algenon L. Marbley**

                                       **Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

**<u>REPORT AND RECOMMENDATION</u>**

Plaintiff, Lynn A. Fox, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. Plaintiff filed her applications for benefits on June 17, 2009, alleging that she has been disabled since August 28, 2005 due to lumbar and cervical spine degeneration, depression, anxiety and generalized weakness.  (R. at 139-42, 143-46, 170.)  Plaintiff later amended her alleged disability onset date to November 21, 2008.  (R. at 13, 71.)  Plaintiff's applications were denied initially and again upon reconsideration.  Plaintiff requested a *de novo* hearing before an administrative law judge ("ALJ").

On March 10, 2011, ALJ Mark A. Clayton held a video hearing at which Plaintiff, represented by counsel, appeared and testified.  A vocational expert also appeared and testified. On April 18, 2011, the ALJ issued a decision in which he found that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 13-24.)  On September 29, 2011, the

Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-5.) Plaintiff timely appealed.

This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors, the Commissioner's Memorandum in Opposition, and the administrative record. (ECF Nos. 13, 18 and 10.) For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's Decision denying Plaintiff's applications for social security disability insurance benefits and supplemental security income.

## I. HEARING TESTIMONY

### A. Plaintiff's Testimony

At the March 10, 2011 Administrative Hearing, Plaintiff testified that she is 5'3" tall and weighs approximately 265 pounds. (R. at 43.) She resides in a second floor apartment with her 18-year-old daughter. She testified that it is "very difficult" to go up and down the stairs. (R. at 44.) She has been using a cane since her neck surgery in December 2010. (R. at 44-45.) The cane had not been prescribed. She left her most recent job as a bookkeeper in December 2006 for various reasons, including difficulty concentrating as a result of preoccupation over her ill daughter and elderly mother. (R. at 49-50.) Prior to that position Plaintiff worked as an administrative assistant for the YMCA for approximately 10 years. (R. at 51.) She stopped working there because the new manager required that she work nights and weekends. (R. at 54.) Plaintiff testified that she was unable to adjust to the new schedule because she was a newly single mother. *Id.*

Plaintiff indicated that she has a driver's license, but that she avoids driving at night and during rush hour because she experiences difficulty turning her neck.   (R. at 45-46.)   She further testified that driving is difficult due to pain and numbness in her hands, arms, neck, shoulders, and lower back.   (R. at 46.)   She also feels shooting pains in her legs while driving which requires her to adjust position.   *Id.*   She stated that these symptoms were becoming progressively worse.   *Id.*   She reported driving to appointments and to the grocery store and stated that she is able to get around the grocery store with a cane and cart.   (R. at 46-47.)

Plaintiff stated that her most severe symptom that prevents her from working is low back and bilateral leg pain, which she reports to be worse on the left side of her body.   (R. at 55-56.)   Plaintiff indicated that she is unable to lie on her left side, that she has to think about picking up her left foot in order to lift it, and that she must constantly change positions at home because of the pain.   *Id.*   She further testified that the pain began following a respiratory infection in April 2008.   (R. at 56.)   She also experiences instability and numbness on her left side with deteriorating motor skills.   *Id.*   Plaintiff stated that the neurologist and neurosurgeon told her that the numbness and weakness in her hands were a result of prolonged pinched nerves in her neck.   ( R. at 57.)   Her understanding is that the purpose of the December 2010 neck surgery was to "stabilize" her neck.   (R. at 45.)   She hoped the surgery would relieve some of her symptoms, but that has not been the case as of yet.   (R. at 57.)   She testified to a decrease in balance since her neck surgery.   (R. at 45.)

Plaintiff also testified that she suffers from fibromyalgia.   ( R. at 59.)   S he stated that any time she gets a virus she suffers excruciating pain throughout her body.   *Id.*   She complained that when she receives immunization or steroid shots she is forced to remain in bed for a week

3

due to pain. *Id.* She stated that the pain in those cases reaches a 10 on an analog pain scale. *Id.* She described the pain as "excruciating, it felt like someone was stabbing" her. *Id.*

With respect to daily activities, Plaintiff testified that she usually gets up around 9:00 a.m. or 10:00 a.m., and that she generally goes to bed around 11:00 p.m. or 12:00 a.m. (R. at 63.) She stated that she sleeps poorly because of pain, which she indicated causes her to wake up approximately every hour. *Id.* She reported lying down about half of the day because of weakness, fatigue, and pain. At the time of the hearing, Plaintiff was not taking any pain medication because she had been kicked out of her pain management doctor's group due to her temper. *Id.* Plaintiff testified that she attends some of her daughter's school events, including football games and choir concerts. (R. at 58-59.)

**B.    Vocational Expert Testimony**

Lynne Kaufman testified as a vocational expert ("VE") at the administrative hearing. (R. at 65–70.) Ms. Kaufman testified that although Plaintiff's past position as an administrative assistant is generally considered a sedentary job, the functions Plaintiff performed brought her position up to the medium strength range. (R. at 66.)

The ALJ posed a hypothetical situation to the VE. In the hypothetical situation, the ALJ asked the VE to consider a person of Plaintiff's age, education, background and work experience who is limited to the sedentary exertional level. This person is also unable to climb ladders, ropes, or scaffolds, and can occasionally climb ramps and stairs. This person can occasionally balance, stoop, kneel, and crouch, but cannot crawl. The person must avoid working on uneven or wet surfaces and must avoid all exposure to hazards. The person likewise must avoid concentrated exposure to pulmonary irritants such as extreme temperature changes, odors, dust,

4

gas, fumes and working in poorly ventilated areas. The person would be limited to frequent push/pull or operating foot pedals with her lower extremities. (R. at 67.) Based on this hypothetical, the VE testified that Plaintiff could perform a job as an administrative assistant as generally performed, but not as she performed it in her past employment. (R. at 68.)

The ALJ posed a second and third hypothetical. In the second, the same person described above was restricted to simple, routine, repetitive tasks. The VE testified that such a person would be precluded from working as an administrative assistant. In the third the hypothetical person was required to be off-task 15 percent of the time, which could include missing two days of work per month. (R. at 68.) The VE testified that such restrictions would eliminate competitive employment or unaccommodated employment. *Id.*

## II. MEDICAL RECORDS[1]

### A.  Hunter Trace Physicians: Jeffrey M. Ayers, D.O. and Courtney R. Young, M.D.

The record contains treatment notes from Hunter Trace Physicians, a primary care group, from December 2004 through January 2010. (R. at 480-547, 694-793.)

Plaintiff visited her primary care physician, Dr. Ayers, in December 2004 for an injury to her finger after getting it caught in the hole of a bowling ball. (R. at 740.)

On July 19, 2005 Plaintiff visited Dr. Ayers "with regard to intractable cough." (R. at 739.) P laintiff completed a course of steroids, which she reported as beneficial.

---

[1] Plaintiff does not challenge the ALJ's evaluation of the medical evidence as it pertains to her mental impairments. (Pl.'s Statement of Errors, ECF No. 13.) Accordingly, the Court will focus its review of the medical evidence pertaining to Plaintiff's physical condition.

On August 29, 2005 Plaintiff saw Dr. Ayers for an injury to her occiput following a fall. Dr. Ayers assessed that Plaintiff had a concussion and an upper respiratory infection.  (R. at 739.)

Plaintiff saw Dr. Ayers on September 30, 2005 for "difficulty with concussion and intractable vertigo."  (R. at 738.)  Dr. Ayers recommended that Plaintiff undergo a neurological exam.

In June 2006, Plaintiff saw Dr. Ayers for drowsiness and leg aches.  (R. at 737.)  Dr. Ayers reported that "[t]his is a complex visit."   Plaintiff also complained of malaise and forgetfulness.   Dr. Ayers' assessment included hypertension; and forgetfulness and depression.

Plaintiff presented to Dr. Ayers in January 2007 for bronchitis.  (R. at 735.)  Dr. Ayers noted bilateral shoulder tenderness and upper thoracic tenderness.

Dr. Ayers examined Plaintiff again on August 24, 2007 for a left hip strain.   (R. at 509.) Plaintiff reported that she tripped over a mattress outside of a dumpster.   Dr. Ayers prescribed Vicodin.

Plaintiff presented to Dr. Ayers on May 5, 2008 with complaints of cough and congestion.  (R. at 507.)   Dr. Ayers noted significant wheezing and forced expiration of pharyngeal edema.  Plaintiff was diagnosed with bronchitis.   On May 13, 2008 and May 22, 2008, Plaintiff presented to Dr. Ayers with continued complaints of cough.  (R. at 506.)   She also complained of shoulder and back pain from coughing for the last two to three weeks.   The physicians continued the diagnosis of bronchitis.

On May 27, 2008, Plaintiff visited Dr. Bevans with complaints of dizziness and left-side numbness.  (R. at 503.)   Plaintiff reported that her symptoms have been getting worse for some

time, and that she has numbness in her left cheek.   On examination, Plaintiff demonstrated full

range of motion in all four extremities.   Plaintiff was alert and oriented.   Dr. Bevan reported

that "[b]ased on her constellation of symptoms, I will [] obtain brain images to rule out any

intracerebral pathology."

On June 10, 2008 Dr. Ayers interpreted the results of the MRI that Dr. Bevan previously

ordered.  (R. at 500.)   Dr. Ayers noted "remote, left temple lobe CVA which again is remote

and probably old."   Dr. Ayers also reported that rate and rhythm was regular, and that EENT is

within normal parameters.   Dr. Ayers planned to order a neurological evaluation.

Plaintiff visited Dr. Ayers on August 8, 2008 to undergo a basic physical for Job and

Family Services.   (R. at 498.)   Dr. Ayers reported that "this is a difficult visit."   He noted that

Plaintiff was under the care of Dr. Gorenstein and another unnamed doctor from The Ohio State

University ("OSU").   He reported that "[t]he current diagnoses after conferring with Dr.

Gorenstein's office are vestibular dysfunction and cervical disc herniation."   He opined, "I feel

that the patient is currently disabled."

Dr. Ayers completed a "Basic Medical Form" for the Fairfield Department of Job and

Family Services during the same visit.   (R. at 812-813.)   He reported that Plaintiff had

diagnoses of small vessel disease of the brain, vestibular dysfunction, and cervical disc disease.

He further reported that she had been suffering from instability and weakness for over three

months.   He opined that Plaintiff could stand or walk for one hour in an eight-hour work day and

could sit less than one hour in an eight-hour work day.   He further opined that Plaintiff could lift

or carry up to 5 pounds frequently.

The record indicates that Dr. Ayers retired in September 2008, at which time Dr. Courtney Young assumed responsibility for Plaintiff's primary care. (R. at 173.)

Plaintiff was examined by Dr. Young on December 8, 2008. (R. at 496.) Dr. Young reported that Plaintiff had been seen by a neurologist at OSU "who was doing a workup for a possible carotid endarterectomy and was found to have elevated liver enzymes." Neurology requested that Plaintiff have a liver ultrasound. Plaintiff reported that "she has been feeling well and is without complaints." She reported that she has had progressive back and leg pain throughout the day. "When she wakes up in the morning, she is fine but as she stands for prolonged periods or walks, she gets low back pain and is relieved with sitting and resting. No numbness or tingling in her feet." Plan: Obtain a liver ultrasound and back x-rays.

An x-ray of Plaintiff's lumbar spine taken on January 5, 2009 revealed that Plaintiff had a partially sacralized L5 vertebra and moderately severe degenerative disc disease and spondylosis along with facet arthropathy at L4-5. (R. at 405-06.) A n x-ray of the right hip taken on January 24, 2009 showed bilateral sacroiliac osteoarthritis and a sacralized L5 vertebra. (R. at 414.)

In February 2009, Plaintiff saw Dr. Young for a follow-up of her lab work and review of MRIs. ( R. at 490-91.) P laintiff reported continued issues with intermittent dizziness, blurred vision and muscle weakness. Dr. Young's assessment included hypertension and dizziness. Plaintiff requested referral to a different neurologist for a second opinion. (R. at 490-91.) S he complained that Dr. Elsheikh was not "taking her symptoms as seriously as they need to be taken as these have been very life-altering for her." Dr. Young indicated that she would refer Plaintiff to another neurologist.

In April 2009, an MRI revealed severe degenerative disc disease.  (R. at 489.)  P laintiff reported that she had cortisone shots for her back but they did not provide relief.   She requested a referral to a back specialist.   (R. at 488.)   Pain management reportedly improved Plaintiff's symptoms.   Plan: Refer patient to a surgeon for evaluation for weight loss.

In May 2009, Plaintiff presented at Hunter Trace Physicians with complaints of not feeling well.   She reported that she "feels a 'pop' in head."   (R. at 487.)

In May 2009, Plaintiff was seen by Dr. Young for her three-month checkup.   (R. at 485.) Plaintiff "denies any nausea, vomiting, dizziness, vertigo, ringing in ears."   She complains of a headache.   She complains of periodically hearing a "pop" in her left, inner ear, followed by a headache.   She reports that the neurologist thinks she may have had a small stroke in the past given her persistent left-sided weakness.   Dr. Young's assessment includes degenerative disc disease, for which she feels possible surgical interventions may help.

In July 2009, Plaintiff presented to Dr. Young with "chronic pain."  (R. at 484.)  D r. Young referred patient to Dr. Masone.[2]

**B.      Aryeh Gorenstein, M.D.**

Consulting otolaryngologist, Dr. Gorenstein saw Plaintiff on July 8, 2008 due to her history of dizziness, which she described as the room spinning lasting from several seconds to minutes while standing or lying down.   (R. at 377.)   An ENG revealed a significant direction-fixed intermittent left-beating positional nystagmus during positional testing with the eyes closed, which was indicative of a non-localizing vestibular lesion, either peripheral or

---

[2] The record contains no treatment notes from Dr. Masone.

central.   An audiogram showed a high frequency hearing loss more on the left.  ( R. at 383.)

Dr. Gorenstein recommended that Plaintiff continue treatment at OSU Neurology.   (R. at 377.)

**C.     Ohio State University Medical Center: Dr. Bakri Elsheikh, Dr. Andrew P. Slivka, and Cheryl Wall, C.N.P.**

Plaintiff treated with neurologist Dr. Elsheikh and Nurse Practitioner Cheryl Wall at OSU

from June 11, 2008 through January 20, 2011.   (R. at 605-620, 821-42, 873-99.)   On June 11,

2008, Plaintiff's complaints included light headedness on standing, vertigo while lying down,

and loss of balance which required her to use walls to support herself to get around at home.  ( R.

at 837.)   Plaintiff indicated that her symptoms started three weeks prior while she was

recovering from severe bronchitis.   The bronchitis set in five weeks prior to this visit.   Plaintiff

reported that, in addition to the symptoms above, she dragged her left foot at times which caused

recurrent falls without injuries.   She also complained of difficulty concentrating and finding

words, as well as garbled speech.   S he reported occasional double vision, shortness of breath,

trouble with bladder control, and muscle tenderness.   *Id.*   Upon examination, Plaintiff

demonstrated a normal gait and stance and full muscle strength throughout.   Her speech was

normal.   Her writing, repetition, reading and copying of a pentagon were all normal.   Dr.

Elsheikh noted that Plaintiff's cranial nerves were intact.   Although he reported that Plaintiff had

"a few tender points to deep palpation," Dr. Elsheikh noted that this would not qualify her for the

diagnosis of fibromyalgia.   Dr. Elsheikh reported that he was not certain he could provide a

single diagnosis that would explain all of Plaintiff's symptoms.   He thought it reasonable to

conduct further testing to assure she does not have a spinal cord lesion, and to perhaps consider

formal neuropsyche testing if her cognitive symptoms persist.   Dr. Elsheikh indicated that an

element of anxiety and stress is further confounding her illness.   (R. at 838.)

Dr. Elsheikh examined Plaintiff on July 16, 2008.   (R. at 836-37.)   Plaintiff continued to

have muscle aches and back pain with activity.   She reported feeling fatigued, tired and weak,

and experiencing dizziness and lightheadedness.   She stated that at times her knees would

buckle as if they were going to give way.   She feels her language and cognitive difficulties are

"somewhat better."   On examination, Plaintiff's muscle strength was five throughout.   She had

decreased pinprick sensation on the left side, including the face.   She also had decreased

vibration on the left forehead.   Her gait and stance appeared normal.   Dr. Elsheikh reported "I

do not see a clear evidence of any ominous neuromuscular disorder."   He stated that it was not

unreasonable to obtain an EMG and nerve conduction study, and perhaps a lumbar spine MRI.

Dr. Elsheikh examined Plaintiff on August 14, 2008.   (R. at 610-11.)   Plaintiff

complained of muscle aches and back pain with activity.   She reported feeling fatigued, tired and

weak.   Dr. Elsheikh noted that "[i]t seems her cognitive difficulties are improving."   He

recommended an EMG and nerve conduction study to ensure there was no radicular disease.

Plaintiff underwent an EMG/NCV in August 2008 which showed no evidence of left

lumbar radiculopathy.   (R. at 620-21.)

When seen for follow-up in November 2008, Plaintiff reported having a virus infection

the week prior that caused a "fuzzy feeling on the left side of her face."   (R. at 608.)   Plaintiff

reported that the infection made her feel worse and she described intermittent bouts of weakness

and confusion.   She complained that pain is her major problem and she described generalized

muscle tenderness, as well as back, neck and joint pain.   She mentioned her shoulders, elbow,

11

wrists, knees and hips.   Plaintiff indicated difficulty sitting or standing or lying in one position for a long time.   She complained of a lack of endurance and generalized subjective weakness. She described generalized headaches, breathing difficulties and chewing difficulties. Examination showed 18/18 tender points to deep palpation.   Dr. Elsheikh reported that he reviewed her MRI of the cervical spine.   He indicated that it shows moderate spinal stenosis with broad bulging disc osteophytes at the C5-6 level.   There was also bilateral neural foraminal stenosis that is worse on the right side.   Plaintiff's neurological examination did not show any locality or lateralizing signs.   Dr. Elsheikh found that "[i]n view of her generalized myalgias and arthralgias, she does qualify for the diagnosis of fibromyalgia."   (R. at 835.)   Dr. Elsheikh added medications and recommended lifestyle changes, including aerobic exercise.   *Id.*

In December 2008, at the request of Dr. Elsheikh, Dr. Andrew P. Slivka examined Plaintiff.   Dr. Slivka noted Plaintiff's symptoms as difficulty walking, speaking, writing, diffuse weakness, and confusion.   (R. at 606-07.)   Plaintiff reported that the symptoms had improved over the past months, but that intermittently since then she will drag her foot, be unsteady when walking, drop objects, and experience an occasional sharp pain in her head.   She also complains of occasional weakness of the upper extremity, more on the left than the right, and lower extremity, more on the right than the left.   Dr. Slivka doubted a vascular etiology for her symptoms.   He suspected her right vertebral was probably hypoplastic rather than occluded, but he did not believe she had any infarct related to this.   Given the association of her symptoms temporally to an upper respiratory infection, Dr. Slivka wondered whether the symptoms are postinfectious in etiology, though her MRI did not indicate such.   His recommendation was that

Plaintiff pursue aggressive management of her blood pressure and periodic monitoring for other atherosclerotic risk factors.

Plaintiff saw Dr. Elsheikh again on September 2, 2009.   (R. at 827.)   Plaintiff reported myalgias and back pain.   She received back injections without much help.   She reported that she drags her left foot when she is tired.   On examination Plaintiff was alert and oriented with normal speech.   She had normal muscle tone and her strength is normal.   She continued to have multiple tender points to deep palpation.   Plan: increase medications and direct Plaintiff to continue optimizing treatment for her vascular risk factors.

Plaintiff saw Dr. Elsheikh on November 18, 2009.   (R. at 824.)   She reported increased generalized myalgias, shoulder, arms and back pain.   She also reported diffuse numbness and tingling.   O n examination Plaintiff was alert and appropriate with normal speech.   She had normal muscle tone and her muscle strength is normal.   She continued to have multiple tender points to deep palpation.

Plaintiff saw Dr. Elsheikh again on December 30, 2009.   (R. at 821.)   P laintiff reported the same symptoms, as well as burning and stabbing pain in the legs and feet.   She stated she cannot sit still because of the pain and she has difficulty focusing.   Examination was normal.   Dr. Elsheikh reported that there is "[n]o doubt that her depression and stresses as well as sensitivity to medications are making her management a difficult one."   He again discussed the value of aerobic exercises.

Plaintiff saw Dr. Shahram Gharibshahi along with Dr. Elsheikh on May 12, 2010.   ( R. at 966.)   Plaintiff stated that since she has been on Elavil the pain is not as excruciating.   She grades the pain as 5-7 daily.   She cannot fall asleep at night until 4-5 a.m. due to pain and in the

13

morning she does not feel refreshed.   On examination Plaintiff's speech, attention and memory were normal.   She was alert and in no acute distress.

Plaintiff had an MRI of her cervical spine on June 29, 2010.   (R. at 931.)   The MRI revealed severe spinal stenosis principally at C5-6 and C6-7 and flattening of the cervical cord. The MRI revealed no cord abnormality.

Plaintiff saw Cheryl A. Wall, C.N.P. at OSU on August 18, 2010.   (R. at 962.)   Plaintiff indicated that her pain is increasing and that although she thinks the fibromyalgia is under control, her neck pain is "something else."   The pain seems to start in the neck and run down her right arm.   Ms. Wall noted that Plaintiff has chronic pain, fibromyalgia, back pain and myalgias. She recommended that Plaintiff seek a second opinion about her neck.

An August 18, 2010 single fiber EMG showed normal results.   (R. at 892-93.)

Plaintiff saw Dr. Elsheikh on October 20, 2010.   (R. at 955.)   Plaintiff reports that since her last visit she was seen at the Spine Center for cervical stenosis.   Plaintiff continues to complain of neck pain with radiation down the arms, as well as low back pain radiating down the left leg.   She does not report muscle pain related to her fibromyalgia.   On examination, Plaintiff continued to have multiple tender points to deep palpation.   Vibration and position sense were normal.   Her sensory exam showed decrease pin prick to above the knees bilaterally.

Specialized nerve testing in November 2010 revealed post-ganglionic dysfunction consistent with small fiber neuropathy in Plaintiff's left foot.   (R. at 891.)

Plaintiff was seen by Nurse Practitioner Wall at OSU in January 2011 in follow up for neck pain with radiation down her arms.   (R. at 947.)   Dr. Elsheikh was available for consultation at this appointment.   (R. at 50.)   Plaintiff reported having surgical fusion on

14

December 21, 2010.   Plaintiff stated that she had not seen improvement in her numbness in her arms as of yet.   She complained of difficulty swallowing.   On examination Plaintiff's gait was wide based.   (R. at 949.)   Nurse Practitioner Wall reported that Plaintiff has probable small fiber neuropathy and the continued diagnosis of firbromyalgia.

**D.      Gerald Smidebush, M.D.**

On July 10, 2008, Dr. Smidebush interpreted Plaintiff's MRI results.   (R. at 379.)   He concluded that there is a broad bulging disc and covering osteophyte at C5-6 causing moderate central stenosis with mild flattening of the spinal cord and bilateral neural foraminal stenosis worse on the right than the left.   Dr. Smidebush also concluded that at C6-7 there is a left paramidline and left lateral disc protrusion causing severe left lateral recess stenosis with slight compression of the left anterior spinal cord.   There is neural foraminal stenosis on the left due to bony overgrowth.

A Magnetic Resonance Angiogram ("MRA") of Plaintiff's brain taken that same day showed the basilar artery was tortuous with normal branches that are patent.   The right vertebral artery was not visualized and has presumed occluded.   The radiologist found no abnormality of the intracranial internal carotid or cerebral arteries.   (R. at 381.)

**E.      Mark M. D'Onofrio, M.D.**

Plaintiff saw orthopedic surgeon Dr. D'Onofrio on February 4, 2009 for complaints of bilateral leg pain which is worse on the right near her knee.   He ordered an MRI.   (R. at 550.) The MRI of the lumbosacral spine taken on February 9, 2009 showed severe degeneration at L4-5 with broad bulging and protrusion and facet arthropathy causing moderate canal and neural foraminal stenosis.   (R. at 552.)   After reviewing the MRI on February 12, 2009, Dr. D'Onofrio

recommended a course of physical therapy and referred Plaintiff for lumbar epidural steroid injections.   (R. at 549.)

Plaintiff attended physical therapy from February 17, 2009 to April 25, 2009.   (R. at 557-82.)   By April 15, 2009, Plaintiff's pain was reduced to 4/10 after therapy, and a TENS unit reduced her pain to 3/10.   (R. at 564.)   On April 22, 2009, Plaintiff reported her pain was "more manageable today" and was no higher than 5/10 during treatment.   (R. at 562.)

**F.     Adam Ueberroth, M.D.**

Plaintiff was seen for a second neurological consultation by Dr. Ueberroth on February 26, 2009 due to multiple neurological complaints and a questionable history of a stroke.   (R. at 461-63.)   Plaintiff stated that her multiple neurological complaints started suddenly in April 2008 and had waxed and waned although overall improved since that time.   Her examination revealed non-physiologic vibration loss on the left side of her head and she had some mild sensory loss on the left side of her body.   Otherwise, her neurological examination was normal. Dr. Ueberroth felt that she had a rather benign symptom complex on neurological examination which was not likely related to an underlying inflammatory disease.   He noted some functional elements to her examination, and that it was possible many of her symptoms were psychiatric in nature and related more to depression and anxiety.   Dr. Ueberroth concluded that he did not have a unifying neurological diagnosis that would explain all of her symptoms, and recommended further studies.   (R. at 461-63.)

**G.     Gretchen Cordero, M.D.**

Dr. Cordero interpreted an MRI of Plaintiff's neck and brain that was taken at Riverside Methodist Hospital on March 26, 2009.   (R. at 811.)   Dr. Caderro noted that, with respect to

Plaintiff's neck, there was no evidence of carolid stenosis.   She also noted patent and dominant

left vertebral artery, and hypoplasia of the right vertebral artery with mild narrowing in its

proximal portion cannot be excluded.   With respect to Plaintiff's brain, Dr. Cordero noted no

acute infarcts or mass effect, left frontal venous angioma with mild surrounding gliosis and a few

tiny foci of white matter signal abnormality most likely related to small vessel ischemia.

**H.      Ronald Linehan, M.D.**

Plaintiff received two lumbar epidural steroid injections administered by pain specialist

Dr. Linehan in March and April 2009.   (R. at 471-74.)   She reported that the first injection

brought her no relief.   (R. at 474.)

**I.      F. Paul DeGenova, D.O.**

Plaintiff reported to consulting orthopedic surgeon, Dr. DeGenova, in May 2009 that the

lumbar epidural steroid injections did not reduce her pain.   (R. at 476.)   Upon examination,

Plaintiff exhibited an antalgic gait, but normal strength bilaterally, intact sensation bilaterally,

normal deep tendon reflexes, and a negative straight leg raise bilaterally.   (R. at 476-77.)   Dr.

DeGenova advised that lumbar spine surgery may or may not provide relief, and that Plaintiff

could obtain relief from her symptoms over time.   (R. at 478.)   Plaintiff elected against surgery

and planned to continue home exercises and use of a TENS unit.

**J.      Leslie Green, M.D. /Gary Hinzman, M.D.**

In September 2009, state agency physician Dr. Green conducted a review of Plaintiff's

medical records.   (R. at 583-590.)   Dr. Green concluded that Plaintiff could lift twenty pounds

occasionally and ten pounds frequently; sit and stand/walk for about six hours each out of an

eight-hour day; frequently stoop, kneel, crouch, and crawl; occasionally balance and climb ramps

17

and stairs; but no climbing of ladders, ropes, or scaffolds; no work on uneven, moving, or wet surfaces; and no exposure to unprotected heights or heavy machinery. State agency physician, Dr. Hinzman affirmed Dr. Green's opinion in March 2010. (R. at 800.)

## K.    Michael Bourn, D.O.

Plaintiff treated with pain specialist Dr. Bourn from July 14, 2010 until November 3, 2010. (R. at 852-72.) Initially Plaintiff reported back and neck pain for the past 2-3 years, which she described as constant aching, sharp, pressure, stabbing pain, radiating to both legs, aggravated by walking. She rated her pain at 5/10 on average. (R. at 871.) Examination revealed dysesthesia at C6-7 on the right, with diminished range of motion in her neck; she had tenderness on palpation, paraspinal muscle spasm, somatic dysfunction, tender trigger points, and painful flexion and rotation. (R. at 871-72.) Dr. Bourn diagnosed chronic pain syndrome. *Id.* At Plaintiff's next appointment, cervical radiculopathy was added to her diagnoses. (R. at 867.) Plaintiff received an epidural steroid injection, but it "did not work for her." (R. at 858.) In subsequent appointments, Plaintiff exhibited 5/5 motor strength throughout; normal gait, deep tendon reflexes, and sensation; full range of motion in her lumbar and cervical spines; and no muscle spasm or tenderness in her low back musculature. (R. at 852, 855, 858, 862, 865.) In October 2010, Plaintiff reported a drastic increase of cervical spine pain and that she has had to increase her medication usage. (R. at 855.) Dr. Bourn referred Plaintiff to Dr. Brightman, a neurosurgeon. (R. at 854.) In November 2010, Plaintiff reported that her lumbar spine pain was "improving." (R. at 852.)

18

**L.     The Spine Clinic: Dr. Francine Pulver**

Plaintiff saw Dr. Francine Pulver at the Spine Clinic on September 26, 2010.   (R. at

957.)   Dr. Pulver noted the results of Plaintiff's most recent MRI of the cervical spine as

follows: Severe spinal stenosis at C5-6 secondary to disc extrusions causing flattening of the

cervical cord with a residual AP diameter of approximately 6mm.   No definite core signal

abnormality.   Multilevel degenerative disc disease.   D r. Pulver noted that Plaintiff's cervical

range of motion was mildly limited with complaints of pain with extension and lateral bending.

Lumbar range of motion was also mild to moderately limited with forward flexion and extension.

Straight leg raise was negative bilaterally.   Dr. Pulvar noted Plaintiff's "cervical spine symptoms

and imaging [as] the most concerning and problematic."   She referred Plaintiff to Dr. Frank

Farhadi for a second opinion.

**M.     H. Francis Farhadi, M.D.**

In November 2010, Plaintiff presented to OSU Comprehensive Spine Center with

neurosurgeon Dr. Farhadi for surgical evaluation of her chronic radicular neck and arm pain.   (R.

at 906.)   Examination of Plaintiff's neck showed range of motion was limited in both flexion

and extension with pain at the end ranges of motion.   After reviewing imaging and examining

Plaintiff, Dr. Farhadi opined that surgery was a reasonable option.   (R. at 906-08.)   On

December 21, 2010 Plaintiff underwent a cervical fusion at C5-6 performed by Dr. Brightman.[3]

(R. at 873.)   When seen by the nurse practitioner in Dr. Elsheikh's office in January 2011,

Plaintiff reported that she had not noticed improvement.   *Id.*

---

[3] The surgical records are not in the administrative record.   Moreover, the ALJ did not have

## III. THE ADMINISTRATIVE DECISION

On April 18, 2011, the ALJ issued his decision.   (R. at 13-24.)   At step one of the

sequential evaluation process,[4]  the ALJ found that Plaintiff had not engaged in substantially

gainful activity since November 21, 2008.   (R. at 15.)   The ALJ found that Plaintiff suffers from

the following severe impairments: obesity, vestibular lesion, degenerative disc disease of the

cervical and lumbar spine, cervical disc bulges, osteoarthritis of the sacroiliac joint, chronic

obstructive pulmonary disease, pulmonary hypertension, obstructive sleep apnea, and

fibromyalgia.   (R. at 15-16.)   The ALJ further determined that Plaintiff did not suffer from an

impairment or combination of impairments that met or medically equaled one of the listed

impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (R. at 18.)   In doing so,

the ALJ explicitly considered the provisions of Section 1.04 in the context of disorders of the

spine, as well as SSR 02-1p with respect to Plaintiff's obesity.   (R. at 18-19.)

---

these records for consideration.

[4]  Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.   *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.     Is the claimant engaged in substantial gainful activity?
    2.     Does the claimant suffer from one or more severe impairments?
    3.     Do the claimant's severe impairments, alone or in combination, meet or
         equal the criteria of an impairment set forth in the Commissioner's Listing of
         Impairments, 20 C.F.R. Subpart P, Appendix 1?
    4.     Considering the claimant's residual functional capacity, can the claimant
         perform his or her past relevant work?
    5.     Considering the claimant's age, education, past work experience, and residual
         functional capacity, can the claimant perform other work available in the national
         economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC"). The ALJ concluded as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can never climb ladders, ropes, or scaffolds; can never crawl; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, and crouch; can frequently push/pull and operate foot pedals with her left lower extremity; must avoid uneven, moving, or wet work surfaces; must avoid all exposure to hazards such as unprotected heights and dangerous moving machinery; and must avoid concentrated exposure to pulmonary irritants such as extreme temperatures, odors, dust, gases, fumes, and poorly-ventilated areas.

(R. at 19.) The ALJ found that although Plaintiff's impairments could reasonably be expected to cause some symptomology, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. (R. at 20.) In reaching this conclusion, the ALJ gave no weight to Dr. Ayers' opinion that Plaintiff is disabled. (R. at 23.) The ALJ found Dr. Ayers' opinion to be "conclusory, and the ultimate issue of disability is reserved to the Commissioner." *Id.* Additionally, the ALJ found that Dr. Ayers' opinion was "not supported by objective medical evidence, physical findings on examination by the physician, or Plaintiff's self-reported abilities." *Id.*

At step five, the ALJ determined that Plaintiff is capable of performing work as an administrative assistant. *Id.* The ALJ acknowledged that Plaintiff would be unable to perform this job as she had done in her previous employment; however, relying on the VE testimony, the ALJ concluded that Plaintiff could perform the job at the standard sedentary level. Thus, the ALJ determined that Plaintiff is not disabled within the meaning of the Social Security Act.

## IV. STANDARD OF REVIEW

Upon review of a case appealing the decision of the Commissioner, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").   Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Services*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.   The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).   Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"   *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir.

2007)).

## V. LEGAL ANALYSIS

In her Statement of Errors, Plaintiff contends that the ALJ erred in (1) giving no weight to Dr. Ayers' medical opinion; and (2) assessing her credibility. After careful review of the record, the Undersigned disagrees.

## A.    TREATING PHYSICIAN RULE

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(d). The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally must give deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408. If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

The ALJ must meet certain procedural requirements if he or she does not afford controlling weight to a treating physician's opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has emphasized the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the requirement that the ALJ provide a good reason is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242)).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will

24

consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.   20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, Plaintiff contends that Dr. Ayer's opinion that she is disabled "was entitled to the weight of rebuttable presumption" because he was Plaintiff's primary care physician since at least December 2004.   (Statement of Errors 16, ECF No. 13.)   Plaintiff further maintains that Dr. Ayers and his associate referred her to multiple specialists over the course of the two and a half years following his determination that she was disabled.   *Id.* at 17.   She criticizes the ALJ for relying on "two State Agency non-examiners of unstated specialty, who reported consideration of only three diagnoses," rather than her primary care physician's disability opinion.  *Id.*

The Undersigned finds no error in the ALJ's rejection of Dr. Ayers' disability opinion. The ALJ provided five reasons for rejecting Dr. Ayers' opinion, all of which are supported by substantial evidence.   First, as the ALJ indicated, Dr. Ayers' August 8, 2008 disability opinion is "conclusory."   (R. at 23.)   Dr. Ayers noted, "I feel that the patient is currently disabled."   (R. at 498.)   Aside from referencing the diagnoses of vestibular dysfunction and cervical disc herniation from another doctor, Dr. Ayers did not provide the basis for his conclusion that Plaintiff is allegedly disabled.   In fact, his treatment note for that visit consists of only one paragraph.   Finally, although Dr. Ayers completed a "Basic Medical Form" for the Department of Job and Family Services, the minimal information he included on the form essentially mirrors that set forth in his treatment note.[5]

---

[5]  The ALJ correctly rejected Dr. Ayers' assessment of Plaintiff's functional capacity as set forth in the "Medical Functional Capacity Assessment" included within the Basic Medical Form.   (R. at 813.)   The determination of a

The other reasons the ALJ offered for rejecting Dr. Ayers' opinion are also supported by substantial evidence.  Dr. Ayers' disability determination was not supported by findings on examination.  (R. at 23.)  Rather, the August 8, 2008 disability opinion appears to rest solely on the diagnoses of Dr. Gorenstein and a second unnamed doctor, rather than Dr. Ayers' own examination of Plaintiff.  (R. at 498.)  Substantial evidence also supports the finding that Dr. Ayers' opinion is inconsistent with the objective medical evidence and with Plaintiff's self-reported activities.  (R. at 23.)  As discussed in further detail in the next section, the objective medical evidence demonstrates that Plaintiff generally presents with normal gait, normal strength, normal range of motion in all four extremities and in her cervical and lumbar spines, and normal reflexes.  (R. at 476, 824, 827, 836, 837, 855, 858, 862, 865.)  Moreover, Plaintiff leads a rather active lifestyle, which further undermines Dr. Ayers' conclusion that she is disabled.  (R. at 699, 704-13.)  Nevertheless, the ultimate issue of whether a claimant is disabled is reserved to the Commissioner.  SSR 96-5P, 1996 WL 374186, at *2 (Jul. 2, 1996).  Finally, as the ALJ recognized, Dr. Ayers opined that Plaintiff was disabled on August 8, 2008.  Plaintiff's amended alleged onset date, however, is November 21, 2008, more than three months after Dr. Ayers' opinion.

Accordingly, the ALJ provided good reasons supported by substantial evidence to reject Dr. Ayers' disability opinion.  It is **RECOMMENDED** that Plaintiff's first statement of error be **OVERRULED**.

---

claimant's residual functional capacity is reserved to the ALJ.  20 C.F.R. § 404.1527; *Bass*, 499 F.3d at 511.

**B.    CREDIBILITY**

Plaintiff next contends that the ALJ failed to properly assess her credibility.   "The ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor."   *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility") (citation omitted).

Despite the deference courts generally afford to an ALJ's credibility determination, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.   "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.*   Furthermore, in assessing credibility, the ALJ may consider a variety of factors including "the . . . frequency, and intensity of the symptoms; . . . [and] the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms . . . ."   *Rogers*, 486 F.3d at 247.

In making a credibility determination, the ALJ "must consider the record as a whole, including objective medical evidence; the claimant's statements about symptoms; any statements or other information provided by treating or examining physicians and other persons about the conditions and how they affect the claimant; and any other relevant evidence."   *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 417 (6th Cir. 2011) (citing SSR 96-7p, 1996 WL 374186, at *2 (Jul. 2, 1996)); *see also Rogers*, 486 F.3d at 247 (acknowledging that credibility must be "based on a consideration of the entire record") (internal quotation omitted).

27

Here, the ALJ concluded that Plaintiff's representations concerning the severity of her

pain lack credibility.   The ALJ indicated a lack of objective medical evidence to support the

intensity, persistence and limiting effects Plaintiff alleges her symptoms to cause.   (R. at 20.)

He conducted the following overview of the medical evidence:

> The claimant has a history of vestibular dysfunction associated with dizziness.
> She received some physical therapy in 2005 for this condition, but discontinued
> treatment due to personal circumstances (Ex. 10/F35-37).   In May 2008, she
> complained of ongoing dizziness and left sided numbness to her primary care
> physician.   On examination, her strength on the left was approximately 10%
> lower than on the right (Ex. 15F/24).   She underwent an MRI of her brain in May
> 2008 which showed only a remote infarctive change in the left temporal lobe (Ex.
> 9F/6).   In June 2008, she presented to an emergency room complaining of
> dizziness and weakness, with recent problems climbing stairs and minor problems
> walking (Ex. 4F).   As part of subsequent testing, the claimant reported balance
> problems, disorientation with mental and physical tasks, and dragging her left leg.
> Positional testing performed as part of an ENG revealed a significant,
> direction-fixed, intermittent, left-beating, positional nystagmus indicative of a
> non-localizing vestibular lesion (Ex. 5F/1).   Subsequent MRA's and MRI's of her
> brain showed no significant abnormalities aside from a venous angioma that
> would explain her symptoms (Exs. 9F/12, 12F/9-10, 19F/1-6, 22F/48).   An EEG
> was also normal (Ex. 12F/5).

(R. at 20.)   The ALJ next determined that the RFC adequately accommodates Plaintiff's

complaints of dizziness by limiting her need to change head positions and limiting her

exposure to potential hazards.

> With regard to claimant's alleged neck pain, her medical records show a long
> history of cervical spine problems.   In August 2005, an MRI showed moderate
> degenerative disc changes at C4-C6 (Ex. 10F/6).   The claimant underwent
> another MRI in July 2008 after complaining of neck pain, dizziness, and gait
> problems.   The MRI showed broad based disc bulging and osteophytes at C5-6
> causing moderate central canal stenosis and neural foraminal stenosis; and a disc
> protrusion at C6-7 causing lateral recess stenosis, neural foraminal stenosis, and
> slight compression of the spinal cord (Ex. 9F/9-10).   X-rays performed in May
> 2010 showed increased degenerative changes at C5-6 and C6-7, with an MRI
> performed in June 2010 showing an extrusion flattening the cervical cord at C5-6
> and an extrusion at C6-7 causing neural foraminal narrowing, cord compression,

and severe spinal stenosis (Ex. 32F/22-24).   In December 2010 the claimant
underwent a cervical fusion (Ex. 32F/1).

The claimant also suffers from degenerative disc disease in her lumbar spine.
She underwent an EMG/NCV in August 2008 after complaining of pain in her left
leg and low back.   The study was normal, with no evidence of lumbar
radiculopathy (Ex. 19F/16-17).   In December 2008, she reported low back pain
with prolonged standing or walking to her primary care physician (Ex. 15F/17).
An x-ray performed in January 2009 showed moderately severe degenerative disc
disease, spondylosis, and facet arthropathy at L4-5 (Ex. 9F/21).   An x-ray of her
hip also revealed sacroiliac osteoarthritis (Ex. 9F/30).   An MRI of the
lumbosacral spine performed in February 2009 showed severe degeneration at
L4-5 with broad bulging and protrusion and facet arthropathy causing moderate
canal and neural foraminal stenosis (Ex. 9F/33-34).   Her orthopedist noted only
tenderness and a mildly positive straight leg raise on examination, and
recommended physical therapy (Ex. 16F/2-3).   Therapy notes indicate her pain
decreased with these exercises and use of a TENS unit, but increased with spinal
injections (Ex. 16F/10-28).

The claimant also visited a pain management specialist for treatment.   Notes from
March 2009 indicate a decreased range of motion in her lumbar spine, tenderness,
hypersensitivity to light touch in her right lower extremity, deep tendon reflexes at
0-1, 4+ strength throughout her lower extremities, and a positive straight leg raise
(Ex. 13F/1-2).   She subsequently received lumbar steroid injections (Ex.
13F/3-4).   However, the claimant continued to complain of back pain radiating
down her legs in April 2009, with treatment notes showing lumbar tenderness and
a positive sitting straight leg raise (Ex. 15F/9).   At a subsequent orthopedic visit
in May 2009, the claimant reported numbness in her right foot in addition to
constant back and right leg pain.   She exhibited an antalgic gait, but normal
strength bilaterally, intact sensation bilaterally, normal deep tendon reflexes, and a
negative straight leg raise (Ex. 14F/1-2).   Her straight leg raise was again
negative on a subsequent examination by her primary care physician (Ex. 31F).

Specialized nerve testing revealed post-ganglionic dysfunction consistent with
small fiber neuropathy in the claimant's left foot in November 2010 (Ex. 32F/19).
However, a single fiber EMG was normal, and a routine EMG showed only mild
right medial neuropathy at the wrist but no large fiber neuropathy (Exs. 32F/1,
33F/11).   An examination showed intact sensation to light touch throughout, but
decreased sensation to pinprick above the left knee and to the right ankle.
Notably, she had normal sensation throughout her arms, hands, and fingers (Ex.
33F/3-4).

The claimant also suffers from fibromyalgia.   As early as November 2008, the
neuromuscular clinic at Ohio State University began following her for this

condition after she exhibited 18/18 tender points to deep palpation (Ex. 19F/4-5).
In September 2009, the claimant reported having good days and bad days, and
indicated she dragged her left leg when tired.   On examination, she exhibited
multiple tender points and decreased sensation on the left side, but had normal
strength and muscle tone (Ex. 19F/12-13).   She continued to exhibit these
findings on subsequent examinations, but showed no worsening despite compaints
of diffuse numbness and tingling in addition to significant pain (Exs 19F/10-11,
29F/1-2).   Notes from her primary care physician from January 2010 indicate the
presence of 18/18 tender points and elevated pain sensation to light touch (Ex.
22F/4).

Imaging results of the claimant's lumbar and cervical spines do show significant
degenerative disc disease and disc bulging with spinal stenosis, respectively.
However, clinical examination results and nerve studies do not support the
severity of the claimant's allegations regarding her back and neck pain with
radiation and numbness and tingling in her extremities.   The claimant generally
exhibited a normal gait with normal muscle strength and tone and normal reflexes
throughout.   Some examinations do indicate numbness in her left arm, face, and
legs (Exs. 12F/3, 19F/6, 32F/15).   However, an EMG/NCV and other nerve tests
showed only mild medial neuropathy in her right wrist, no large fiber neuropathy,
and indicated the presence of small fiber neuropathy only in her left foot.   The
medical evidence does not document consistent radicular symptoms in her lower
extremities.

In addition, the claimant's treatment history suggests her lower back symptoms
and fibromyalgia pain stabilized or even improved with treatment.   Notably, pain
management sessions in 2010 reduced the claimant's low back pain, and records
from her fibromyalgia provider indicate stable symptoms with medication.
Unfortunately, the claimant testified that she had been kicked out of pain
management therapy due to a temper issue, and had yet to find a new pain
management provider to continue progress.

As for the claimant's cervical spine, her records indicate she underwent a cervical
fusion in December 2010 in an attempt to relieve her pain.   However, records
from only one post-operative treatment visit were submitted, and the notes from
this one visit fail to indicate whether she obtained any lasting pain relief.   The
claimant's representative was given additional time to submit such records, but
failed to tender any records from her surgery or post-surgical check-ups other than
this single visit.

(R. at 22.)   In addition to this overview of the objective medical evidence, the ALJ found

that Plaintiff's "activities, as documented in her medical records, also call into question the

30

credibility of her allegations of severe pain, instability, and poor motor skills."  (R. at 22.)   The ALJ found that Plaintiff "remains very active in her daily life, including performing household chores, cooking and baking, chopping vegetables, peeling and cutting eggs, and wrapping presents and decorating for Christmas."   *Id.*   According to the ALJ, "[a]ll of these activities require considerable motor skills."   *Id.* at 22-23.   Moreover, Plaintiff "also tans, goes to the mall on a regular basis, and hosts family gatherings."   *Id.* at 23.   The ALJ determined that these "activities are inconsistent with [Plaintiff's] allegations of severe pain."   *Id.*

The Undersigned declines to disturb the ALJ's credibility determination.   First, substantial evidence supports the ALJ's conclusion that Plaintiff's allegations are inconsistent with the objective medical evidence.   The ALJ conducted a thorough examination of the objective medical evidence.   (R. at 20-22.)   The Court's independent review of the evidence demonstrates that Plaintiff generally presents with a normal gait.   (R. at 824, 827, 836, 837, 855, 858, 862, 865.)   She generally exhibits full range of motion in all four extermities and in her cervical and lumbar spines.   (R. at 503, 852, 855, 858, 862, 865.)   She exhibits normal muscle strength as well.   (R. at 476, 824, 827, 836, 837, 852, 855, 858, 862, 865.)   Plaintiff also has normal reflexes.   (R. at 476.)   On June 11, 2008, Plaintiff's speech was normal, as was her writing, repetition, reading and copying of a pentagon.   (R. at 837.)   In December 2008, Plaintiff reported that her symptoms related to difficulty writing, speaking and confusion had improved.   (R. at 606.)   In December 2009 Dr. Elsheikh reported the results of his examination of Plaintiff as "normal."   (R. at 821.)   Plaintiff's August 18, 2010 EMG showed normal results as well.   (R. at 892-93.)

31

Plaintiff's reports of pain contained within the medical records are also inconsistent with her allegations that she suffers from disabling pain.  On August 18, 2010, Plaintiff reported that her "fibromyalgia is under control."  (R. at 962.)  During another appointment Plaintiff reported that her pain was "no higher than 5/10 during treatment."  (R. at 562.)  On July 14, 2010, she indicated that on average her pain was a 5/10.  (R. at 871.)  Plaintiff has repeatedly indicated that pain management and physical therapy have reduced her pain.  (R. at 488.)  For example, she stated that physical therapy reduced her pain to a 4 on a ten-point scale, and that adding a TENS unit further reduced her pain to a 3.  (R. at 564.)

Additionally, substantial evidence supports the ALJ's determination that Plaintiff's activity level further calls into question the credibility of her allegations of disabling pain.  It is appropriate for an ALJ to consider a claimant's daily activities in determining the credibility of her complaints.  *See Walters*, 127 F.3d at 532 ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating the claimant's assertion of pain or ailments.") (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990)).  The United States Court of Appeals for the Sixth Circuit has upheld an ALJ's rejection of a plaintiff's credibility where the plaintiff's activity level is inconsistent with allegations of disabling pain. *See, e.g.*, *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (upholding a rejection of a plaintiff's credibility where his activities "included washing dishes, light cooking, and doing laundry," as well as shopping, attending church, visiting friends, and going to the mall); *Vance v. Comm'r of Soc. Sec.*, 560 Fed. App'x 801, 805 (6th Cir. 2008) (finding a plaintiff's "activities of daily living [] inconsistent with the level of pain and fatigue alleged" where he admitted "mopping and sweeping three times per month, doing laundry twice a week while carrying

laundry baskets with clothes, [and because he] cooks, cleans, does dishes, drives up to one hour without a break, and shops for groceries alone some of the time").

Substantial evidence supports the ALJ's credibility determination.   The ALJ conducted a thorough analysis of Plaintiff's activities.   (R. at 22.)   He noted that Plaintiff engages in activities that "require considerable motor skills."   (R. at 22-23.)   He further noted that "[s]uch activities are inconsistent with [Plaintiff's] allegations of severe pain."   (R. at 23.)

The Court's independent review of the record confirms that substantial evidence supports the ALJ's conclusion.   In July 2009, Plaintiff's daughter, Tiffany Booze, reported that Plaintiff does the cooking, cleaning, and laundry in her household, and that she decorates her home.   ( R. at 186.)   She also reported that Plaintiff bathes and feeds her dogs on a regular basis.[6]   (R. at 185.)   Ms. Booze further indicated that Plaintiff "spends quite a bit of time running her daughter to doctor's appointments."   *Id.*   Plaintiff shops for groceries for herself and for her elderly mother, and she also shops for arts and crafts supplies and discount clothing.   (R. at 187.)   Ms. Booze further stated that Plaintiff eats meals out with her friends and family.   (R. at 188.)   She reported "no changes" in Plaintiff's hobbies and interests since the onset of her alleged disability.[7]   (R. at 188.)

Plaintiff's journal also substantiates the ALJ's finding that Plaintiff's activity level is inconsistent with her allegations of disabling pain.   Plaintiff frequently goes tanning and

---

[6]  Plaintiff initially reported that her youngest daughter cares for the pets; however in the same questionnaire she indicated that she feeds and waters them.   (R. at 194.)

[7]  Approximately six months after Ms. Booze completed this questionnaire, she filled out another report in which she described Plaintiff's condition as far more severe than she initially indicated. (R. at 228.)   The ALJ discounted the report as inconsistent with Plaintiff's self-reported and self-recorded abilities.   (R. at 23.)   Additionally, the Undersigned notes that Ms. Booze indicated in the second report that she did not have personal knowledge of the representations she

shopping at the mall.  (R. at 699, 704, 705, 706, 709, 710, 711, 712, 713.)  She does household chores.  (R. at 705, 709, 711.)  She also goes out to dinner at restaurants on a fairly regular basis.  (R. at 699, 706, 710.)  She hosts family gatherings for holidays and to watch football games.  (R. at 699, 709.)  She frequently shops for groceries and logged numerous shopping trips for Christmas gifts.  (R. at 700, 703, 709, 711, 713.)  She does considerable cooking, baking, and meal preparation.  (R. at 701, 708, 709.)  She makes social visits to other people's homes.  (R. at 709, 710.)  She wraps Christmas gifts.  (R. at 701.)  She reported going to the zoo for three hours.  (R. at 702.)  She decorates for the holidays.  (R. at 703.)  She cares for her teenage daughter, which includes driving her to various appointments; and she runs errands for her elderly mother.  (R. at 704, 706, 708, 712, 714.)  The record also demonstrates that Plaintiff cares for her young granddaughter at times, and even lifts her up and holds her occasionally.  (R. at 707, 714.)  Plaintiff reported vacationing with her daughter in New York in August 2010.  (R. at 880.)  Although Plaintiff complains that engaging in these activities causes her pain, her activity level provides substantial evidence for the ALJ's conclusion that her pain is not disabling.

Accordingly, substantial evidence supports the ALJ's credibility determination.   It is **RECOMMENDED** that Plaintiff's second statement of error be **OVERRULED**.

## VI. CONCLUSION

It is, therefore, **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's Decision denying Plaintiff's applications for social security disability insurance benefits and supplemental security income.

made therein.   (R. at 235.)

## VII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.   28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived.   *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date: February 12, 2013                           __/s/ *Elizabeth A. Preston Deavers*_____
                                                  Elizabeth A. Preston Deavers
                                                  United States Magistrate Judge